UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 09-50051 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| GILLMAN RODDY LONG, | ) | |
| a/k/a DAVE GILLMAN LONG, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Defendant Gillman Roddy Long is before the court on an indictment charging him with three counts of aggravated sexual abuse of a child. See Docket No. 3.  Mr. Long filed a motion to suppress, seeking to exclude from evidence at trial the statements he gave to law enforcement agents on June 5, 2009, and June 11, 2009.  See Docket No. 127.  The government resists this motion.  See Docket No. 129.  The Chief District Judge, the Honorable Karen E. Schreier, referred the motion to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The following are this court's findings and conclusions.

## FACTS

Evidentiary hearings were held on Mr. Long's motion on Wednesday, May 18, 2011, and Wednesday, June 1, 2011.  Present at both hearings were

Mr. Long, his counsel, Monica Colbath, and Assistant United States Attorneys Sarah Boensch Collins and Britt Haxton. The government presented the testimony of one witness, Special Agent Sherry Rice of the Federal Bureau of Investigation ("FBI"). Mr. Long presented the telephonic testimony of Dr. Ryan Nybo. From this evidence, the court makes the following findings of fact.

Agent Rice has been an FBI agent for over 19 years. For the last eight years she has been assigned to investigate violent crimes on the Pine Ridge Indian Reservation in the District of South Dakota. In April, 2009, she was assigned to investigate a report that Mr. Long had sexually abused a female victim, A.P., who was over the age of 12 but under the age of 16. Agent Rice went to Mr. Long's house to see if he would agree to an interview with her on Friday, May 29, 2009, at approximately 11:40 a.m. Agent Rice introduced herself, told Mr. Long that she was an FBI agent, and told Mr. Long that she was investigating the allegation that he had sexually abused A.P.

Mr. Long indicated that he had been drinking alcohol already that morning and that he did not want to interview. Agent Rice thanked Mr. Long for his honesty. The two agreed that Agent Rice could interview Mr. Long the following Monday, June 1, 2009.

On June 1, Agent Rice telephoned Mr. Long to confirm the interview before traveling all the way to his home on the reservation. The call was placed at approximately 10 a.m. Mr. Long told Agent Rice that he was again drinking

alcohol already that day and declined to interview. However, Mr. Long indicated that he was coming to Rapid City, South Dakota, on Thursday, June 4, 2009. Agent Rice's offices are in Rapid City. The two agreed that the interview would take place at the offices of the FBI in Rapid City on June 4. Agent Rice thanked Mr. Long for his honesty concerning his ingestion of alcohol. On June 3, Mr. Long telephoned Agent Rice to confirm that he would be at her office the next day.

Mr. Long never showed up for the interview on June 4. After business hours, at approximately 6:40 p.m., Mr. Long called Agent Rice's cell phone and left a message indicating that he would come to her office the next day, Friday, June 5, 2009. The two did not speak personally to each other.

Mr. Long arrived at the Rapid City FBI offices at approximately 1:35 p.m. on June 5, 2009. Agent Rice came out to the reception area to greet him. She shook Mr. Long's hand and reminded him of who she was. Agent Rice was dressed casually and was wearing her service weapon, but that weapon was not displayed as it was hidden beneath her untucked shirt.

Mr. Long introduced Agent Rice to C.L., his 11-year-old daughter who had accompanied Mr. Long. Agent Rice asked if C.L. could remain in the reception room while she and Mr. Long visited. Mr. Long agreed and Agent Rice led him to an interview room. Never at any point after this did Agent Rice, Mr. Long, or Agent Michael McRoden speak about C.L. in any way or discuss

the Department of Social Services, criminal charges with regard to C.L., charges of driving while under the influence, or child abuse with regard to C.L.

The interview room at the FBI office is approximately 10 feet by 15 feet in size. There are two doors to the room, one leading to the reception area from which Rice and Long had just come, and one leading to an office area, which door could only be opened from the office area side. The door to the reception room was unlocked and Agent Rice told Mr. Long that this was the case. The room contained a desk, with one chair behind it and two chairs in front of it. There was a small table along one wall and a child's table with two children's chairs.

When Rice and Long entered the interview room, a second FBI agent, Michael McRoden, was present. Agent Rice introduced Mr. Long to Agent McRoden. McRoden assumed the seat behind the desk. Agent Rice and Mr. Long sat in the chairs facing the desk with their backs to the door to the reception area. Agent Rice told Mr. Long that he was not under arrest at that time and that he would not be arrested that day. She also told him that the interview was voluntary. Agent Rice told Mr. Long that the door to the interview room was unlocked and that Mr. Long could get up and leave at any time.

Agent Rice took the lead in questioning Mr. Long, but Agent McRoden asked a few questions as well. Agent Rice asked Mr. Long about personal

identifying information such as his name, address, social security number and date of birth. She asked what his education had been. Mr. Long replied that he had attended school through the 10th grade and then later obtained his General Equivalency Diploma. He indicated he then attended two years of technical schooling for automotive repair, and an additional two years of specialty training on diesel engines.

Agent Rice asked Mr. Long if he was taking any prescription medications. Mr. Long indicated that, in the past he had taken prescription medicine, but that he was not currently taking any. When asked about ingesting alcohol, Mr. Long told Agent Rice that he had last drank alcohol at approximately 7:30 p.m. the night before and had not had any alcohol since then. Agent Rice did not ask Mr. Long how much he had had to drink before quitting at 7:30 p.m. or for how long a period of time he had been engaged in drinking alcohol, but Mr. Long did tell Agent Rice that he was hung over and not feeling very well. Mr. Long may or may not have asked that a garbage can be placed near him. If he had made such a request, Agent Rice would have moved the garbage can that was in the room to a location near Mr. Long.

Agent Rice observed no indication that Mr. Long was intoxicated at the time of this interview. He did not slur his words and he did not stumble or lose his balance. Agent Rice testified that Mr. Long understood each of her

questions and answered appropriately. She observed no indication that Mr. Long was cognitively impaired in any way.

After asking about these preliminary matters, Agent Rice told Mr. Long again that the reason she wanted to interview Mr. Long was that an allegation had been made that he had sexually abused A.P. Agent Rice asked some background questions designed to establish where Mr. Long had been living, if he had been living in the same residence as A.P., and when those time frames of joint habitation had occurred. Then, at 1:50, only 15 minutes into the meeting, Mr. Long got up and asked if they could continue the interview at a later date. Mr. Long explained that he was not feeling well due to his hangover. Agent Rice readily agreed and Mr. Long left.

Never at any time during this 15-minute interview did Mr. Long ask for food, drink, or cigarettes. He never complained of pain or confusion. He never asked for the presence of counsel.

In an attempt to continue the interview with Mr. Long, Agent Rice along with a third FBI agent, Charles Blackburn, traveled to Mr. Long's home on Pine Ridge on June 11, 2009. The agents arrived at the home at approximately 10:15 a.m. and learned that Mr. Long was not at home. The agents re-entered their vehicle and began to drive away when they spotted Mr. Long driving toward his home. The agents reversed course and returned to the Long residence.

Mr. Long was just returning from a trip to the grocery store.  When the agents exited their vehicle, Mr. Long was already outside of his vehicle but not yet inside the house.  Agent Rice greeted Mr. Long and introduced him to Agent Blackburn.  She inquired if Mr. Long would be willing to resume the interview concerning the allegations about Mr. Long and A.P.  Mr. Long agreed to continue the interview, but asked for time to put away his groceries.  The three agreed to resume the interview at the Pine Ridge Attorney General's ("A.G.") office, a short distance away.

Agents Rice and Blackburn traveled to the A.G.'s office and waited for Mr. Long outside the front entrance.  Mr. Long met them there at approximately 10:28 a.m.  Agent Rice thanked Mr. Long for agreeing to meet them and led Mr. Long to the room used for the interview.  No description was given as to Agent Blackburn's appearance.  Agent Rice testified that she was dressed casually in cargo pants with a polo shirt.  She was wearing her service weapon, but it was concealed beneath her untucked shirt.

The room the agents and Mr. Long entered was someone's office.  It was approximately 10 feet by 10 feet in size.  It had a single door that was unlocked at all times.  The office contained a desk with one chair behind it, a table along one wall with a computer on it, boxes of documents and numerous papers around the office.  The agents had to bring extra chairs into the room to accommodate all three people.  The chairs were arranged in circular fashion

facing each other with nothing in between the chairs.  Mr. Long sat down in the chair closest to the door.  The agents sat in the other two chairs facing Mr. Long and to either side of him.

Agent Rice repeated the advisements she had previously given Mr. Long on June 5.  She told Mr. Long that he was not under arrest at that time, that he would not be arrested that day, that the interview was voluntary, and that Mr. Long could stop the interview and leave at any time.  Mr. Long indicated that he understood.

Agent Rice asked Mr. Long if he had been drinking, and he replied that he had not.  There was some dispute about this fact at the hearing as Agent Rice did not record the fact that she asked Mr. Long about any alcohol consumption in her 302 Report.  She testified, however, that she thought she had recorded this information in her handwritten notes taken contemporaneously at the interview and from which the 302 was prepared.  Also, Agent Rice testified that she had an independent memory of having asked Mr. Long about whether he had recently consumed alcohol at the June 11, 2009, interview.

At Mr. Long's counsel's request, the court ordered Agent Rice to produce copies of her handwritten notes to the court for *in camera* review, and then to Mr. Long's counsel.  Although neither party subsequently moved for the notes to be admitted as an exhibit at the evidentiary hearing in this matter, the court

recites the fact that Agent Rice's handwritten notes contained a notation that Mr. Long was "Not Drunk."

In addition to having asked Mr. Long if he had consumed alcohol, Agent Rice testified that she observed no outward indication that Mr. Long was under the influence of any intoxicating substance. Specifically, Agent Rice testified that she did not observe any odor of alcohol on Mr. Long, no slurred or nonsensical speech, and no problems maintaining balance. Furthermore, based on her past encounters with Mr. Long, Agent Rice stated that she believed Mr. Long had shown a willingness to tell her if he felt he was too impaired to interview. Agent Rice stated that on those past occasions when Mr. Long excused himself from interviewing because of alcohol consumption, Agent Rice always thanked him for his honesty and never implied that he would suffer any negative consequences as a result of refusing to interview.

After asking Mr. Long about his alcohol consumption, Agent Rice told him that she wanted to talk to him about any sexual acts between him and A.P. Agent Rice asked Mr. Long how he had met Brenda Brewer. Mr. Long began talking to Agent Rice about things he had heard about A.P. Agent Rice stated that she wanted to hear *not* about things Mr. Long had heard, but about his own experiences with A.P. At this, Mr. Long described an incident in which A.P. had rubbed her chest against his back. Right after this statement, Mr. Long told the agents that he did not want to incriminate himself and that

9

he wanted to stop talking.  The interview ended with Agent Rice explaining to Mr. Long that she would be drafting a report on the allegations regarding A.P. and giving the report to the United States Attorney's Office, which office would review the report and determine whether to prosecute.

     Twelve (12) minutes elapsed between the time Mr. Long arrived at the A.G.'s office and the time he left.  Never during this 12 minutes did Mr. Long express any pain or confusion.  Never did he ask for food, drink, coffee, or cigarettes.  He never requested to go to a restroom.

     During both the June 5 and the June 11 interviews, the FBI agents remained calm and conversational at all times.  They never raised their voices.  They never became angry.  They never moved from their initial sitting positions.  They did not move closer to Mr. Long, stand over him, point at him, or physically threaten him in any way.  They made no promises of any kind, other than the promise that he was not under arrest and would not be arrested that day.  They never lied to Mr. Long or practiced any type of deception on him.

     Dr. Ryan Nybo, a forensic psychologist with the federal detention center at Seattle-Tacoma (SEA-TAC), evaluated Mr. Long as part of a competency issue.  Dr. Nybo produced a written report, filed in this case at Docket No. 112, of which the parties agreed the court should take judicial notice of the intellectual functioning portion of the report, found at pages 7 and 8.  In addition, Dr. Nybo testified telephonically.

The intellectual functioning portion of Dr. Nybo's written report states in its entirety as follows:

> Mr. Long's performance on the WAIS-IV indicated that he was in the Low Average range of intellectual functioning when compared with individuals his age, with an estimated full scale intelligence quotient (IQ) of 86. This score places him in the 18th percentile. Mr. Long's Index scores, with their accompanying ranges, are as follows: Verbal Comprehension (81; Low Average to Boderline), Perceptual Reasoning (96; Average), Working Memory (97; Average), and Processing Speed (81; Low Average to Borderline). His nonverbal perceptual reasoning skills and working memory are significantly better developed than are his verbal comprehension and processing speed. A relative weakness was detected in word knowledge. These results appear to be an accurate estimate of Mr. Long's true intellectual functioning.

See Docket No. 112, at pages 8-9 (pages 7-8 of the actual report).

Dr. Nybo explained during his testimony that "WAIS-IV" stands for Wechsler Adult Intelligence Scale, Fourth Edition. The WAIS-IV consists of 10 subtests and 4 indexes, which yield a total IQ score. Among mental health professionals, the WAIS-IV is considered the "gold standard" for evaluating intelligence.

Dr. Nybo explained that Mr. Long's full scale IQ places him at the low end of average. He stated that two-thirds of all adults will score between 85 and 115 on the WAIS-IV. The lowest possible score on the WAIS-IV is 40 and the highest score is 130. Dr. Nybo considered Mr. Long's results on the WAIS-IV to be valid as Mr. Long was fully engaged during the test and gave every appearance of having given his best effort on the test. Mr. Long's IQ score is average, but on the low end of average. His score places him in the 18th

percentile of all persons taking the test, meaning that 82 percent of all persons taking the test would score higher than Mr. Long.

Dr. Nybo testified that Mr. Long's IQ score indicated that he suffers from no significant intellectual impairment. However, Dr. Nybo cautioned that one cannot extrapolate from Mr. Long's test results to a particular factual situation and draw conclusions. In particular, Dr. Nybo testified that one cannot infer anything about Mr. Long's functioning and understanding in the two FBI interviews at issue here on the basis of his WAIS-IV test results.

Dr. Nybo testified that there is agreement among mental health professionals that there is some cultural bias in the WAIS-IV test as concerns Native Americans such as Mr. Long. Specifically, Native Americans who have been raised on Indian reservations and attended reservation schooling appear to score lower as a whole in the area of verbal comprehension. Dr. Nybo attributed this to cultural factors. Dr. Nybo testified that, in cases such as Mr. Long's, Mr. Long's actual intelligence may actually be higher than is reflected in his verbal comprehension score due to this cultural bias in the test. Dr. Nybo's supposition is supported by the fact that Mr. Long scored noticeably higher in other areas of the test such as perceptual reasoning and working memory, where his scores were solidly in the middle of the average range.

Mr. Long now moves to suppress both of the statements he made to the FBI on the grounds that his statements were not voluntary. The government resists Mr. Long's motion in its entirety.

## DISCUSSION

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. See also Withrow v. Williams, 507 U.S. 680, 688-89 (1993) (continuing to adhere to the totality of circumstances test). The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action*. Id. at 165. Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching. Id.

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary. A defendant's mental status is still relevant under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it. See Townsend v. Sain, 372 U.S. 293, 298-99 (1963) (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant); Blackburn v. Alabama, 361 U.S. 199, 207-08 (1960) (defendant's statement involuntary where police were aware of defendant's history of mental problems, knew that he was "probably insane," and proceeded with interrogation); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts). Where a defendant suffered

14

from some mental infirmity that caused him to want to confess and police were unaware of that infirmity, courts have found the necessary state action to be missing.  Connelly, 479 U.S. at 164-65; United States v. Rohrbach, 813 F.2d 142, 144-45 (8th Cir. 1987).

The existing precedent outlines the type of police conduct that courts have found to be coercive.  The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state.  See Spring, 479 U.S. at 574; Davis v. North Carolina, 384 U.S. 737, 739-53 (1966) (defendant held for 16 days of incommunicado interrogation in a closed cell without windows); Reck v. Pate, 367 U.S. 433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe v. Connecticut, 367 U.S. 568, 569-70, 621-22 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); Ashcraft v. Tennessee, 322 U.S. 143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without sleep).  It is this body of law which the court applies to Mr. Long's assertion that his statement was involuntary.

In Turner, police officers stopped Turner's vehicle after observing erratic driving. Id. at 553. Officers administered field sobriety tests to Turner and concluded that he was under the influence of some drug other than alcohol. Id. at 554. After arresting Turner and advising him of his Miranda rights, officers transported him to jail and conducted a urine test, which came back positive for phencyclidine (PCP). Id.

Officers again advised Turner of his Miranda rights and Turner signed a waiver form, initialing each admonition. Id. During the interview, Turner appeared cooperative; however, he subsequently exhibited bizarre behavior. Id. Upon examination, several psychiatrists diagnosed Turner with a having a PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-average to borderline range. Id. Turner moved to suppress the statements he made to law enforcement, arguing that, because of his low IQ, PCP intoxication, and mental illness, he did not have the mental capacity to intelligently and knowingly waive his constitutional rights. Id.

The court rejected this argument, finding the following facts persuasive: Turner was cooperative during the interview; he reviewed and initialed each admonition of the waiver form; he agreed to answer questions; he gave accurate information; and he appeared intelligent enough to understand his rights. Id. at 555. See also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the

16

right to counsel is usually strong proof of the validity of that waiver...");
Rohrbach, 813 F.2d at 145 (in determining that defendant's waiver was knowing and intelligent, the court found persuasive the fact that his history of arrests, convictions, and reform school made him quite familiar with the criminal justice system). The Turner court concluded that Turner's waiver of his Miranda rights was knowing and intelligent. Turner, 157 F.3d at 557.

Based on the legal analysis of Connelly and its progeny, the court considers all the facts and circumstances surrounding Mr. Long's statements in determining whether those statements were voluntary. Withrow, 507 U.S. at 688-89; Fulminante, 499 U.S. 279; and Fenton, 474 U.S. at 109-10. In this context, the court also considers Mr. Long' personal characteristics to the extent they were known to the agents. Blackburn, 361 U.S. at 207-08; Makes Room For Them, 49 F.3d at 415; Jenner, 982 F.2d at 333.

Based on Connelly and its progeny, the court concludes that Mr. Long's statements were voluntary. The length of the interviews were both extremely brief. Mr. Long was told before each interview began that he had a right to end the interview whenever he wished. No psychological pressure, promises, lies, threats, or any other stratagems were employed by the agents.

It is true that the FBI agents could have made more than a surface inquiry as to the extent of Mr. Long's drinking prior to these interviews. For example, the agents could have inquired how much Mr. Long had had to drink

17

and for how long a period of time he had continuously been drinking. However, where the situation was as presented here and Mr. Long gave no outward indication of currently being intoxicated, the court cannot conclude that the agents' failure to ask these additional questions amounted to coercion. As the Turner case discussed above indicates, intoxication does not render a statement involuntary per se. That conclusion is even stronger where there is no conclusive evidence that the defendant *was* intoxicated.

Furthermore, Mr. Long's intelligence does not render his statement involuntary. First of all, as stated above, even if Mr. Long's IQ could be considered to be a factor that rendered him more susceptible to having his will overborne, there is no evidence that the FBI agents knew of his IQ and acted to exploit that factor. The Eighth Circuit has noted that as long as the suspect is of average intelligence, his statements will usually be held to be voluntary. United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) (*en banc*) (citing United States v. Astello, 241 F.3d 965, 968 (8th Cir.), cert. denied, 533 U.S. 962 (2001) (holding that an eighteen-year-old with an eleventh-grade education understood what was being said during the interview); Simmons v. Bowersox, 235 F.3d 1124, 1134 (8th Cir.), cert. denied, 534 U.S. 924 (2001) (holding that confession was voluntary where suspect had an IQ of 88)). Here, Mr. Long's IQ was average, though at the low end of average. There is nothing about his IQ that leads to a conclusion that his statement was involuntary.

The most persuasive evidence that Mr. Long's will was strong and was not overborne is how he conducted himself in and around the interviews and attempts to interview him.  On one occasion, an attempt to interview Mr. Long was precluded by Mr. Long himself, recognizing that he was too inebriated to want to interview and refusing to talk to the agents.  On the two occasions where Mr. Long did consent to begin talking to the agents, he was told at the inception of the interview that he could end the interview at any time.  He in fact exercised that right in short order in both interviews, cutting the interviews off after a very brief time.  This, more than anything else, paints a picture of a suspect who is assertive and does not hesitate to express his will in a way that is contrary to what figures of authority might wish.  Accordingly, the court recommends denying Mr. Long's motion to suppress in its entirety.

## CONCLUSION

This court respectfully recommends that Mr. Long's motion to suppress [Docket No. 127] be denied in all respects.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require *de novo* review by the district court.  See

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    Dated June 3, 2011.

                        BY THE COURT:

                        /s/ *Veronica L. Duffy*
                        VERONICA L. DUFFY
                        UNITED STATES MAGISTRATE JUDGE